IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 09-62 GMS |
| | ) | |
| RONALD BRIGHT, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

### I.   INTRODUCTION

On June 2, 2009, the Grand Jury for the District of Delaware indicted Ronald Bright

("Bright") on twenty-eight counts of false tax return preparation, in violation of 26 U.S.C. § 7206(2),

two counts of willful failure to file an individual tax return, in violation of 26 U.S.C. § 7203, and

seven counts of making a false statement, in violation of 18 U.S.C. § 1001(a).  Presently before the

court is Bright's Motion to Suppress Statements.  The court held an evidentiary hearing in

connection with this motion on January 20, 2010.  The court subsequently directed the parties to file

proposed findings of fact and conclusions of law.  After having considered the testimony elicited

during the hearing and the arguments presented in the parties' submissions on the issues, the court

will deny Bright's motion.

### II.   FINDINGS OF FACT

At the evidentiary hearing, the United States called two witnesses: Thomas Sorrentino

("Sorrentino") and Anthony LoPiccolo ("LoPiccolo"),[1] both special agents with the Internal Revenue

---

[1] Sorrentino has been an IRS special agent for over 16 years and LoPiccolo has been an IRS special agent for over 5 years.  (See Transcript of Hearing on Defendant's Motion to Suppress ("Tr.") at 4, 50.)

Service (the "IRS") Criminal Investigation Division.  Bright did not call any witnesses.  The following represents the court's essential findings of fact as required by Rule 12(d) of the Federal Rules of Criminal Procedure.

On June 5, 2008, Sorrentino and LoPiccolo were involved in a search warrant executed at 1408 North King Street in Wilmington, Delaware.  (See Transcript of Hearing on Defendant's Motion to Suppress ("Tr.") at 5.)  1408 North King Street is a combination of Bright's place of business and his residence.[2]  (Id.)  The agents arrived at the location and attempted to enter it at approximately 8:45 a.m.  (Id. at 5, 14.)  After arriving, the agents[3] walked up to the front door of the premises, where LoPiccolo performed a "knock and announce," loudly knocking on the front door and announcing that there were federal agents present to execute a search warrant.  (Id. at 6.)  The agents received no response.  (Id. at 7.)  LoPiccolo knocked and announced two more times and received no response.  (Id.)  LoPiccolo then called two telephone numbers for the defendant without response.  (Id.)  At that point, two to three minutes had elapsed since the agents initially approached the row home, and the agents decided to breach the front door with a battering ram.  (Id. at 7, 18, 47.)  After breaching the front door, the agents entered a vestibule area and came to two doors, one leading to the main floor of the location and the other leading upstairs.  (Id. at 8, 19.)  The agents

_____

[2] 1408 North King Street is a "row home-type setting."  (Id. at 5.)  It is an end unit on the left hand side of the row.  (Id.)  There are approximately two or three steps leading to the front porch and front door.  (Id.)  According to LoPiccolo, the house is "a two-story brick home in Wilmington.  The downstairs is where [] Bright operated his tax preparation business, and he lived upstairs."  (Id. at 51.)

[3] Sorrentino and LoPiccolo were two of eleven IRS agents present to execute the search warrant.  (Id. at 8, 14.)  The agents were dressed in bulletproof vests, which displayed their badges, and were armed.  (Id. at 17, 31-32, 52.)  Two officers from the Wilmington Police Department also were present at Bright's residence/business.  (Id. at 14.)

2

knocked and announced at the door to the main floor and breached the door after receiving no response. (Id. at 8.) Nine agents then entered the main floor to "clear" the area, or make sure that no one was present. (Id.) Once the agents cleared the main floor, one of them attempted to reach Bright by telephone. (Id.) Sorrentino could hear the telephone ringing in Bright's residence, but no one answered it, so the agents pried open the door to the second floor. (Id. at 8-9.)

Sorrentino, LoPiccolo and three other agents went up the stairs to the second floor. (Id. at 9, 64.) Once at the top of the stairs, Sorrentino heard Bright yell in his direction from one of the bedrooms. (Id. at 9, 22.) Sorrentino approached the bedroom with his firearm drawn and found Bright laying in bed. (Id. at 9, 22-23.) Sorrentino trained his weapon on Bright and told him to get his hands up, a command to which Bright complied. (Id. at 9-10, 12, 23-24.) Sorrentino asked Bright if he had any weapons, and Bright responded that he had one in bed with him and asked Sorrentino if he wanted to see it. (Id. at 11, 24.) At that point special agent Robert Delgado ("Delgado") entered the bedroom and, along with Sorrentino, escorted Bright out of the bed. (Id.) More specifically, Delgado stepped in, secured Bright's left hand around the wrist, and instructed Bright to get out of the bed. (Id. at 12, 24.) Sorrentino then holstered his weapon. (Id.) Delgado then escorted Bright, who was wearing a tank top and boxer shorts, downstairs to the living room area. (Id. at 12-13.) While Delgado and Bright were walking down the stairs, Delgado told Bright that he would explain what was happening when they got to the living room area. (Id. at 13.) Bright was compliant during the process. (Id. at 12.) Delgado did not use any handcuffs or restraints while escorting Bright down the stairs. (Id. at 44.) A search of Bright's bedroom yielded three loaded firearms. (Id. at 12.)

Once downstairs, Bright sat down on the couch in his living room area, where he was then questioned by LoPiccolo while the agents searched his residence. (Id. at 13, 33, 57.) Sorrentino and special agent Raymond Green were present during the interview. Sorrentino did not ask questions; rather, his role was for containment, or to make sure that Bright wasn't free to roam around the residence during the search and to escort Bright to the bathroom if he needed a break. (Id. at 13-14, 33, 45.) Green's function during the interview was to take notes. (Id. at 33-34, 40.)

As the interview began, Bright was still wearing his underwear and tank top, but was provided with shorts at some point. (Id. at 34, 41, 53.) LoPiccolo presented Bright with a copy of the search warrant. (Id. at 51.) LoPiccolo advised Bright that the officers had a warrant to search the premises for evidence of false tax return preparation, that he was under criminal investigation, that the officers did not have an arrest warrant, and that he was free to leave. (Id. at 54.) LoPiccolo then read Bright the IRS' non-custodial statement of rights, Form 5661, which reads:

> As a special agent, one of my functions is to investigate the possibility of criminal violations of the Internal Revenue laws, and related offenses.
>
> In connection with my investigation of your tax liability (or other matter), I would like to ask you some questions. However, first I advise you that under the 5th Amendment to the Constitution of the U.S., I cannot compel you to answer any questions or to submit any information if such answers or information might tend to incriminate you in any way. I also advise you that anything which you say and any documents which you submit may be used against you in any criminal proceeding which might be undertaken. I advise you further that you may, if you wish, seek the assistance of an attorney before responding. Do you understand these rights?

(Gov't Ex. 1.) In response, Bright stated that he understood his rights and that he would only answer the questions that he chose to, and would cut off the questioning when he decided. (Tr. at 57.) LoPiccolo further advised Bright that he would have to stay in a clear area along the couch and move

4

around with an escort if he decided to remain while the agents executed the search warrant. (Id. at 56.)

LoPiccolo asked the questions in a conversational tone. (Id. at 59.) He began the interview by asking Bright about his job as a Certified Public Accountant ("CPA"), educational background, work history and experience with the IRS. (Id. at 58.) Bright confirmed that he previously had worked as an IRS agent for seventeen or eighteen years before opening his own tax preparation business. (Id. at 58.) During the interview, which lasted approximately three hours, Bright sometimes responded in a calm tone and occasionally would "flare up" about the search warrant. (Id. at 59, 66.) Further, Bright seemed comfortable with the agents during the course of the interview, as he sat back on the couch, kicked up his feet onto the coffee table, and smoked a cigar. (Id. at 57.)

At the conclusion of the interview, the agents escorted Bright upstairs to get some lunch. (Id. at 60.) Bright then returned to the couch, while the agents continued to search his residence. (Id. at 60-61.)

## III.   CONCLUSIONS OF LAW

In his motion to suppress, Bright argues that the IRS agents' questioning of him, on June 5, 2008, amounted to a custodial interrogation, during which the agents failed to administer the necessary warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966), in violation of his Fifth Amendment rights. Thus, Bright argues that any inculpatory statements he made to the agents during their questioning must be suppressed.

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." Thus, *Miranda* warnings and a

valid waiver are prerequisites to the admissibility of any statement made by a suspect during a custodial interrogation. *Miranda*, 384 U.S. at 476. "An individual is in custody when he or she has been 'deprived of his [or her] freedom of action in any significant way.'" *United States v. Jacobs*, 431 F.3d 99, 104 (3d Cir. 2005) (quoting *Miranda*, 384 U.S. at 444). An individual who has not been arrested is in custody when something is "said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006). The determination of whether statements are the product of a custodial interrogation must be made on a case-by-case basis, *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999), and the ultimate question is whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

"Courts consider a variety of factors when determining if a person was in custody, including: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning." *Willaman*, 437 F.3d at 359-60 (citations omitted).

Applying the five factors set forth in *Willaman*, the court concludes that the circumstances surrounding the agents' interview of Bright are not indicative of a custodial detention. First, it is undisputed in the present case that LoPiccolo advised Bright that he was not under arrest and free to leave. Bright's brief concedes this point and states, "[i]n this case, . . . the agent informed [the]

6

defendant that he was not under arrest and was free to leave." (D.I. 37 at 8.) Thus, the first *Willaman* factor militates against a finding that Bright was in custody.

Second, LoPiccolo's interview of Bright took place in Bright's residence/business, not in a police station or other more intimidating location. *United States v. Vidal*, 85 Fed. Appx. 858, 862 (3d Cir. 2004) (unpublished opinion); *see Willaman*, 437 F.3d at 360 (citing *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) ("When a person is questioned *on his own turf*, . . . the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.")). Because the questioning occurred at Bright's residence/business, the court finds that the physical surroundings were not intimidating and made it less likely that a reasonable person in Bright's position would have felt he was unable to end the questioning and leave. Thus, the second *Willaman* factor militates against a finding that Bright was in custody.

Third, the length of time of LoPiccolo's interview – approximately three hours – gives the court some pause. Courts, however, "have found interrogations lasting anywhere from one and one-half to seven hours to be non-custodial." *United States v. Killingsworth*, 118 Fed. Appx. 649, 651-52 (3d Cir. 2004) (unpublished opinion) (citing *Beckwith v. United States*, 425 U.S. 341, 342-45 (1976) (non-custodial interrogation lasted three hours); *United States v. Wolk*, 337 F.3d 997, 1006-07 (8th Cir. 2003) (non-custodial interrogation lasted one hour and twenty minutes); *Czichray*, 378 F.3d at 824 (non-custodial interrogation lasted seven hours); *Leese*, 176 F.3d at 744-45 (non-custodial interrogation lasted one hour)). Thus, the court finds the third *Willaman* factor neutral under the totality of the circumstances.[4]

---

[4] Bright argues that the court should find the three hour interview lengthy, because it was conducted after he was "roused from his bed by armed officers, and given that he was taken downstairs without showering, eating or using the bathroom." (D.I. 37 at 9.) Bright, however, provides no support for this argument and the court concludes that these facts are irrelevant to the

7

Fourth, LoPiccolo, Sorrentino and Green did not use coercive tactics such as hostile tones of voice, the display of weapons or physical restraint of Bright's movement during their interview of him. LoPiccolo asked Bright the questions in a conversational tone. Moreover, Bright seemed comfortable during the interview, as he sat back on the couch, kicked up his feet onto the coffee table, and smoked a cigar. In addition, the agents honored his request for shorts, and his request to eat lunch at the end of the interview. Thus, the fourth *Willaman* factor militates against a finding that Bright was in custody.

Fifth, Bright voluntarily agreed to speak with the agents. Indeed, Bright agreed to answer questions after LoPiccolo read him the IRS non-custodial statement of rights form. Bright advised LoPiccolo that he would cut off the questioning when he decided that he didn't want to talk any longer. Bright then answered questions regarding his job as a CPA, educational background, work history and experience with the IRS. Thus, the court finds that the fifth *Willaman* factor militates against a finding that Bright was in custody.

The court, however, does find some aspects of the agents' search coercive. Specifically, the court notes that eleven IRS agents and two Wilmington Police officers were present at Bright's residence/business to conduct the search. The agents were dressed in bulletproof vests, which displayed their badges, and were armed. In addition, Sorrentino, upon hearing Bright yell in his direction, approached the bedroom with his firearm drawn. Sorrentino trained his firearm on Bright, who was laying in bed, until Delgado stepped in, secured Bright's left hand, and escorted him out

---

length of the interview.

8

of bed and downstairs to the living room area while. Finally, LoPiccolo advised Bright that he would be under escort if he needed to move about the residence/business during the course of the search.[5,6]

Nevertheless, having considered the evidence, the court concludes that these coercive aspects of the search did not convert the agents' interview of Bright into a custodial interrogation. Indeed, the presence of armed and uniformed agents, and limitations on a person's movement or a brief detention are often characteristics of a search. *United States v. Kofsky*, No. 06-392, 2007 WL 2480971, at * 27 (E.D. Pa. Aug. 28, 2007) (citation omitted) (finding that the defendant was not in custody despite the following facts: (1) the search was conducted by twenty-three agents, most of whom were armed and wore agency wind-breakers or vests with agency initials; (2) the agents initially restrained the defendant for five to ten minutes at the start of the search; and (3) the agents accompanied the defendant at all times during the search); *see Vidal*, 85 Fed. Appx. at 859 (finding

---

[5] Bright further argues that the fact that LoPiccolo had information reflecting his culpability supports a finding that he was in custody during the interview. The court disagrees. Bright correctly points out that the information known to an officer concerning a suspect's culpability can be a factor relevant to a custody determination. (D.I. 37 at 9) (citing *United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005). The court, however, finds the information known to LoPiccolo of no moment in the present case, because LoPiccolo and the other agents were present at Bright's residence/business to serve a search warrant related to alleged criminal conduct. *See Vidal*, 85 Fed. Appx. at 861-62 (affirming the district court's finding that the totality of the circumstances demonstrated that the defendant was not in custody during the execution of a search warrant).

[6] The court also finds coercive the fact that the agents, in executing the search warrant, used force to breach three doors to Bright's residence/business. The government, citing cases from the First, Ninth, and Tenth Circuits, argues that this initial use of force does not indicate that Bright was in custody, because courts focus on the circumstances during the questioning itself. (D.I. 36 at 11-12.) The court has conducted its own research on the initial use of force, and it appears that the Third Circuit has not yet addressed the issue. The court concludes, however, that it need not decide whether the government's statement is correct, because Bright does not contend that the agents' initial use of force is a factor which weighs in favor of a finding that he was in custody during his interview.

that the defendant was not in custody or physically restrained, even though he was accompanied by agents when he got dressed and moved about the house, and even though the search was conducted by fourteen agents). Accordingly, under the totality of the circumstances, the court concludes that a reasonable person would have felt that he was at liberty to terminate the interview and leave. Thus, the court will deny the defendant's motion to suppress.

Dated: June 21, 2010

_____
CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 09-62 GMS |
| | ) | |
| RONALD BRIGHT, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY

ORDERED THAT:

1.    The defendant's Motion to Suppress Statements (D.I. 16) is DENIED.

Dated: June __21__, 2010

_____
CHIEF, UNITED STATES DISTRICT JUDGE